## Respublica *against* Elizabeth Sergeant and Esther Waters, executors of David Rittenhouse, esq. deceased.

An account of the state treasurer, examined, approved and settled by the comptroller general, and examined and entered by the register general, and approved of by the Supreme Executive Council, and warrant drawn for the balance, cannot be opened and questioned, after one year has elapsed from the time of settlement, under the act of assembly of 18th February 1785.

APPEAL from the settlement of the accounts of David Rittenhouse, late state treasurer, by the register and comptroller general. It was stated to be an account of interest paid by the treasurer on new loan debt ; a balance was struck therein, as due from the estate of David Rittenhouse, late treasurer, deceased, *to the commonwealth, arising from errors in his statement of new loan debt of . . £10,171 8s. 6¼d. [*544
Interest was charged thereon for 10
years, 4 months . . . . 6,306 5s. 8d.
_____
£16,477 14s. 2¼d.
Dollars, 43,940, 55 cts.
The following note was subjoined to the account :
"Note, interest is charged from 20th December 1790, being
"the time of general settlement of his accounts, whereon by
"the examination, which then took place, a balance appeared
"to be due to him of £5438 6s. which was paid to him by a
"warrant.
"Examined and entered,
"SAMUEL BRYAN,
"Reg. General's Office, 18th April 1801."
"Approved and entered,
"JOHN DONALDSON,
"Compt. General's Office, April 18, 1801."
An issue being formed under the appeal, the cause came on to trial at the sittings on the 2d July last, when the following special verdict was found :
"The jury find, that on the 17th December 1790, the accounts
"of David Rittenhouse as treasurer were settled by the comp-
"troller and register general. That the settlement was reported
"to the Supreme Executive Council, and by the council ap-
"proved, and a warrant drawn in favour of David Rittenhouse
"for the balance, *prout* the said settlement by the register and
"comptroller general, the minutes of the Supreme Executive
"Council and warrant."

[Respublica *v.* Rittenhouse's Executors.]

The settlement was contained in a small folio book, contain-ing the treasurer's account of debts and credits, and a balance of 5438l. 6s. struck as due to him, and subscribed in the follow-ing manner:

"Examined, approved and settled the above and foregoing "accounts, saving that any further errors which may appear in "favour of the state, or treasurer may be rectified, and the same "may be paid as due.

"JOHN NICHOLSON,

"Comptroller General, 7th December 1790.

"Examined and entered the above balance, arising from the "accounts in this book, including the account of errors stated "by the comptroller general, reserving a right of debiting or "crediting any further errors, which may be discovered.

"JOHN DONALDSON,

"Reg. General, Dec. 17, 1790."

*The book in the hand writing of the treasurer, stated his transactions from the 1st September 1789, until the 9th November following; but the balance struck by him was altered; and there appeared a sheet therein wrote by the then comptroller general, wherein sundry errors supposed to have arisen from the year 1783 to 1789, inclusively, are stated to have been corrected and rectified by him.

The minutes of the council were as follows:

"In the Supreme Executive Council of Pennsylvania, which "met at Philadelphia, on Saturday, December 18th, 1790.

"The report of the comptroller and register general upon an "account of David Rittenhouse, esq. late treasurer of the state, "until the    November 1789, settled by the register and comp-"troller general the 17th instant, by which there appears to be "due to the said treasurer the sum of 5438l. 6s., was read and "approved by council."

"The council met, Philadelphia, Monday, December 20, 1790.

"The following order was drawn upon the treasurer, to wit: "in favour of David Rittenhouse, esq. for the sum of 5438l. 6s., "being a balance due to him upon his account as late treasurer "of the state, until    November 1789, as settled by the comp-"troller and register general on the 17th of this month, accord-"ing to the comptroller and register general's report."

"The jury further find, that in the year 1800 or 1801, cer-"tain errors were discovered, which were stated in an account, "and that the errors discovered as aforesaid amount to 27,123 "dollars and 80 cents.   And upon the whole of the above facts, "the jury find for the commonwealth the sum of 27,123 dollars "and 80 cents damages, with 6 cents costs, subject to the opin-"ion of the court, whether the plaintiff's suit or claim to the "said sum was barred by any law or laws of this common-"wealth."

The special verdict was argued this term by Messrs. M'Kean

and Lewis for the commonwealth, and by Messrs. Ingersoll, Rawle and Dallas, for the defendants.

On the part of the commonwealth it was contended, that the verdict was partly general and partly special. Facts are stated for the opinion of the court, but they are confined to such as are expressly found.

The defendants' strong hold rests on the 11th section of the act of 18th February 1785, (2 St. Laws 250) which after giving authority to the comptroller general to re-view and re-settle any account by him settled, which shall not be appealed from, and *on which no issue shall have been tried, and to do jus- [*546 tice therein to the commonwealth or the party, as the case may be, provides that such error be discovered within one year after the award of the officer, in any case which shall be laid before the Supreme Executive Council, after which time the settlement and award shall not be again opened or questioned, but the party, his heirs, executors or administrators, shall be forever quieted touching the same. The greatest abuses may arise from the construction, which is now set up, as in the case of county treasurers, where the proper debits are not introduced in their accounts, or improper credits have been allowed to them. The limitation was no doubt made in favour of individuals, but was never intended to sanctify frauds or palpable errors, injurious to the interests of the community, and repugnant to the plainest principles of justice.

It will not be denied, that in an account stated and settled between merchants, if errors shall be afterwards discovered therein, the injured party has his remedy. Nor can it be said, that the commonwealth was meant to be put in a worse situation than individuals in this particular. It is of no moment whether the errors arise from accident or design; they are deemed fraudulent in law. Lord Mansfield says, there may be many cases, where the assertion of a false fact, though unknown to be false to the party making the assertion, will be fraudulent. There may be cases too which fraud will take out of the statute of limitations. Doug. 632 (656.) Our statutes of limitation and the British statute of 21 Jac. are couched in general terms. The latter begins to run only from the time of discovery of a fraud. Booth v. Booth, 1 Bro. Parl. Ca. 445. 13 Vin. 542, ca. 3. The statute of limitations is no plea, where the bill charges a fraud; but the bill must charge, that the fraud was discovered within six years before the bill filed. South Sea Company v. Wymondsell, 3 Wms. 143.

An agreement may be set aside by reason of a mistake in the parties making it, if the point misconceived be the cause of the agreement. Mosel. 364. So if a party enter into an agreement respecting a claim, capable of being precisely ascertained, and is ignorant of the precise value of it, but stipulates under an idea and with an intent, that what he is to receive, shall be equal

3 Yeates—32

in value to that which he has a claim to, equity will set aside the agreement, if the thing to be received is inadequate to the price of the claim. 1 Vez. 400. 2 Pow. Contr. 196, 197, 198. Fraud or covin may avoid every kind of act. 3 Co. 77. What circumstances and facts amount to such fraud or covin is always a question of law. 1 Burr. 396.

*547] *But independent of the great principles of distributive justice, which imperiously demand that plain errors in accounts should be corrected, provided the same be done in a reasonable time after their discovery, the account here was stated on the 17th December 1790, with an express reservation by both of the accounting officers, that any errors either in favour of the state or treasurer, should be rectified thereafter. No law prevents or forbids such reservation ; and the treasurer might certainly assent thereto, the benefit thereof being mutual. He must have attended when the settlement was made, for it is idle to speak of an *ex parte* settlement of accounts in such a case. He must have known of the restriction, and that room was left for the correction of errors, when the account received the approbation of council, and he obtained his warrant. It is true, the treasurer was not bound to receive an account stated, with such reservations ; but he has acquiesced therein, and it must now be imputed either as his fault, folly or misfortune. If he thought himself subjected to unreasonable hardships, or that the public officers did not discharge the trust reposed in them, he had his remedy either by mandamus or impeachment.

The committee appointed to examine the accounts and official transactions of John Nicholson the comptroller general, did not make their report until the 9th January 1794, (Hog. St. Tri. 111) and then for the first time it was discovered, that the state treasurers had been credited by a sum of 11,598l. 9s. 9d. over and above the sums which from the indorsements on the certificates appeared to have been paid ; but that it would require a very long examination and a comparison of the indorsements on each certificate with the corresponding payments at the treasury, before it would be possible to discover exactly, where the mistake or the fault lies. Ib. 125. It is true, the amount of the new loan debt was known, and the four years interest thereon might be readily ascertained ; but the treasurer was not entitled to credit on the amount thereof, until it appeared to have been paid.

In December 1795, the balance due from the state treasurer, was considered as part of the funds of the state ; and on the 4th April 1798, the legislature appropriated $1541, for the payment of clerks, to be employed in the office of the comptroller general, in settling the accounts of the late comptroller general and state treasurers. 4 St. Laws, 268. And on the 11th April 1799, the further sum of $1500, for the same purposes. Ib. 488. These acts shew the sense of the government, and do not impair former contracts.

[Respublica v. Rittenhouse's Executors.]

But it is also contended, that what was done in 1790, was no *legitimate settlement, so as to operate as a bar. The [*548 act of 18th February 1785, (2 St. Laws, 247,) refers to the act for methodizing the department of accounts, by the appointment of a comptroller general, passed 13th April 1782, (Ib. 44,) under the 1st section whereof, the public accounts were to be audited, liquidated and adjusted by the comptroller general; and under § 2, the accounts when settled, were to be transmitted with the vouchers to the president and council, who were to be satisfied with the justice of the settlement.· The act of February 1785, in § 3, gave the dissatisfied party the liberty of an appeal; and by § 5, the executive might direct a suit in the name of the commonwealth.

By the act of 28th March 1789, (2 St. Laws, 704,) a register general was to be appointed. By § 3, the comptroller general shall submit all accounts, which he shall thereafter adjust, before he shall finally settle the same, to the inspection and examination of the register general, and shall take his advice and assistance in making such settlements, which shall be laid before the Supreme Executive Council. By § 4, the register shall keep proper books and transfer the balances, at the time of passing this act, and where the accounts cannot be finally settled, so much as can be settled, &c.

Under the act of 1st April 1790, (Ib. 787,) § 4, all accounts thereafter made by individuals or bodies politic, and all accounts thereafter to be opened between this state and such bodies politic or individuals, shall in the first instance be submitted to, examined, liquidated and adjusted, by the register general; and he shall after liquidation and adjustment, transmit the same to the comptroller general, for his examination and approbation, with the vouchers and evidence; who shall in like manner transmit the same to the president and council for their final approbation.

By construing the introductory and enacting words of this section together, it is apprehended that the legality of this settlement must be judged of by that act. It does not appear, that the register general did in the first instance, examine, liquidate and adjust this account; and unless the requisites of the law have been pursued, the bar does not arise, though a warrant afterwards issued, which forms part of our complaint. This suit is not brought on the settlement, but for money had and received, though it originates on the appeal from the settlement in 1801. It was incumbent on the defendants to have satisfied the jury, that the register general has examined the vouchers, and liquidated and adjusted the balance; but this has not been done. The jury have submitted the legality of the settlement to the court, who will form their decision thereon, from the words of the law *as written, and not on the report of the account- [*549 ing officers to the house of representatives in 1800, or at any other period.

Moreover, the settlement of 1790, does not include the sum

in dispute. The register general has only examined and entered the above balance, arising from the accounts in this book, &c.— The book only contains the official transactions of the treasurer, from the 1st September to the 9th November 1789, but not those of the year 1786, when the error arose from a double charge of payments. The register does not appear to have examined all the accounts, but has judged from the sums exhibited to him. He does not undertake to say, the balance is justly due, but under the 4th section of the law of 28th March 1789, he makes a partial settlement, where a final one could not be made. To construe this as a final settlement, will do manifest violence to the plain meaning of the department of accounts. The jury here have done, what it was the duty of the accounting officers to have done.

It has been intimated, that great inconveniences will arise from extending the liens as to the estates of public officers. But it will be remembered, that the lien only goes as to the sum found due on settlement, and therefore no injurious consequences can possibly ensue therefrom.

Mr. Lewis suggested, during the argument, his doubts that John Donaldsan, esq. was not the regular officer which the law required on the 20th December 1790, the schedule to the constitution having made no provision in the 2d and 3d sections thereof, for the continuance of persons in office, who had been appointed by legislative authority. The third Tuesday of December happened on the 21st December 1790. But he relinquished the point, and the same was not spoke to.

The counsel for the defendants lamented the hardship of their client's case, in having tried the cause at so late a day. It appeared from the Journals of the house of assembly, that Mr. Rittenhouse resigned his office as state treasurer on the 9th November 1789, and rendered his accounts the same year.

The facts were notorious, that he died on the 26th June 1796 (about eleven years and four months after the passing of the act of 18th February 1785.) His wife, who did much of the business of his office, died in 1798, and John Nicholson died in a state of derangement in 1801. Consequently there was no one, who could give any information as to what passed at the settlement in 1790, except Mr. Donaldson. A small book too, containing an account of rectified errors, was missing at the trial, *and—[the court directed them to confine themselves to the facts set out in the special verdict.] *550]

The cases cited on the part of the commonwealth, are not applicable to the questions before the court. Booth *v.* Booth, and South Sea Company *v.* Wymondsell were cases of gross fraud. The court in judging a special verdict will not infer fraud not found therein. The error is supposed to arise from mistake in casting up the accounts. But fraud and error are distinct in their nature. Mitford 208, 212. The expressions of Lord Mans-

FIELD in Doug. 632, (656) to the extent they have been carried, as referable to this transaction, produce this notable effect, that notwithstanding the strong marked words of the proviso in the 11th section of the act of 18th February 1785, a public account shall never be said to be closed, if it is suggested, that there has been an assertion of a false fact therein, which is denominated fraudulent. And thus every public account may be overhauled and re-examined at any indefinite period after the death of the party and his witnesses, though in the plainest terms a *quietus* has become the irrevocable grant of the legislature, when one year has elapsed after a final settlement by the department of accounts. No features of an agreement exist in the present case. Accounts stated between merchants, are not within the provision of the statute of limitations, *aliter* of accounts current. 15 Vin. 119, pl. 3, 110 pl. 4, 5. 2 Saund. 127. Vent. 91. 1 Mod. 70. 2 Mod. 312. The statute of limitations says nothing of bills in equity, but these are construed to be within it, 2 Equ. Ca. Abr. 579. ca. 9. 2 Com. Dig. 261, (last ed.) though in cases of misrepresentation.

It was the policy of the law of February 1785, consulting equally the interests of the community and of individuals, that public accounts should be finally closed. The reservation of future errors cannot be binding on the treasurer, unless he freely and fully assented thereto. But he has done no act to validate this restriction. The settlement when completed, went up as a matter of course to the Supreme Executive Council for their approbation. It was a mere official report, an *ex parte* act of the accounting officers, repugnant to the words and meaning of the law. It lay on the commonwealth to shew that the treasurer knew of the manner in which the accounts were subscribed. The year allowed by the act of 18th February 1785, can only refer to latent errors. While the account remained in the hands of the register and comptroller general, it might be said with some plausible reason, that the reservation would apply; but it can have no such effect, after the settlement had been transmitted to council.

*It has been urged, that the settlement in 1790, was not legitimate, and therefore no bar; and that it must be [*551 governed by the words of the act of 1st April 1790. To this it is answered, that the law of 1790 only applies to accounts thereafter made or thereafter to be opened between the state and bodies politic or individuals; and consequently it cannot refer to this account, which was exhibited in November 1789. But supposing the case to be otherwise, the words *examined, approved, settled* and *entered* imply essentially examination of vouchers, liquidation and adjustment. The register general liquidated and adjusted the account in fact, and in one instance charged the treasurer with 444l. 11s. 10d.

The extent of the settlement appears to be the great question;

and is presumed, that it possesses every ingredient of a full and final settlement.

Mr. Rittenhouse did all in his power.  He surrendered up all his books, vouchers and accounts.  Within 13 months after his settlement, a balance sheet was made out by Mr. Donaldson, of all the years of his treasurership.  He is debited with the balances of the several years in the books of the register general, and No. 4, in the account, on which the appeal is founded, comprehends the accounts of the year 1786, and all the errors found therein.  The accounts of each year are kept separate, and the balances are transferred to other books.  In the nature of the thing, the errors could not possibly be ascertained, unless all the accounts were examined.  Both of the officers in the account sued for, stated 18th April 1801, call the transaction in 1790 a general settlement, and there is no essential difference in the subscriptions to the two accounts.  Unless therefore the settlement of 1790 is supposed to be a final one, there could be no legal appeal from the account settled in 1801.  The orders in council on the 18th and 20th December 1790 reserve no error, but state the account as settled.  The power of drawing warrants only exists on a final settlement being made, under the 2d section of the act of 13th April 1782.  And the 21st section of the 1st article of the state constitution declares, that money shall not be drawn out of the treasury, but in consequence of appropriations made by law.

The two laws of the 4th April 1798 and 11th April 1799 can have no effect on the decision of this question.  Though they may shew the sense of the legislature, yet if the settlement of 1790 operated as a discharge to the treasurer by virtue of the act of 18th February 1785, and he was quieted thereby, subsequent legislatures could have no power to impair the former *552]  *contract.  Those acts will be controlled by the constitution, and remain *sub graviori lege.*

We will only subjoin, that if in truth, error has crept into the accounts of Mr. Rittenhouse, the community may console themselves that it has operated to the compensation of a man, who possessed the most splendid talents, and was an ornament to his country.

SHIPPEN, Chief Justice.  The jury find that David Rittenhouse's accounts as treasurer of the commonwealth, were settled on the 17th December 1790, by the comptroller and register general, which settlement was reported to the Supreme Executive Council, and by them approved, and a warrant drawn in his favour for the balance.  The jury further find, that in the year 1800, or 1801, certain errors were discovered in the treasurer's account, to the amount of $27,123, and 80 cents, which sum they find due to the commonwealth, subject to the opinion of the court, whether the claim of the commonwealth to that sum was barred by any law or laws of the state.

By the act of 18th February 1785, the comptroller general is authorized to settle all accounts between the commonwealth and the public officers and others, and if he discover any sums of money unaccounted for to the state, to correct former settlements and rectify mistakes; provided such error be discovered within one year after the award of the comptroller, in any case which shall be laid before the Supreme Executive Council, after which time, the settlements and awards aforesaid shall not be again opened or questioned, but the party, his heirs, executors and administrators shall be for ever quieted touching the same.

By a subsequent act of 1st April 1790, the register general is associated with the comptroller.   The former is directed to examine, liquidate and adjust, and the comptroller is to examine and approve, and the Supreme Executive Council are to approve. This however only respects such demands, as shall thereafter be made, and accounts thereafter to be opened between the state and individuals; as to former demands and accounts exhibited before the passing of this act, and accounts opened and exhibited before, they were left under the former law to be examined, approved and settled by the comptroller, and examined and entered by the register.   This is precisely the form, in which the accounts of David Rittenhouse were settled: and being approved by the Supreme Executive Council, there is a positive bar as to any future demands, arising from a discovery of errors after one year.   It may not be consistent with justice and equity, that a palpable error discovered many years after *should not be accounted for.   But the imperious directions of the law must be obeyed; and we are compelled [*553 to say by express words, the state is barred from recovering this money after such a length of time.

YEATES, J. The great question on which the determination of this case must turn is, was the settlement made by the comptroller and register general a final settlement, within the true meaning of the act of 18th February 1785?   For whatever our sense of natural justice may be, or however strongly our personal feelings, as honest men, may lead us to rectify plain errors in matters of a pecuniary nature, when discovered, we are bound by the imperious words of the law to declare, that a final settlement, approved of by the Supreme Executive Council, cannot " be opened or questioned after one year, but the party, his " heirs, executors and administrators, shall be forever quieted " concerning the same."

It has been objected on the part of the commonwealth that the account has been passed, with a special exception of errors by both of the accounting officers, and therefore, a re-examination of the account may be gone into, under the plain words of reservation.   This might have been the case, if the treasurer had also subscribed it, or clear proof had been given that he had assented to the exception, provided that it had been done with-

in a reasonable time. The treasurer might have waved the clause in the law, which was founded on principles of public policy, operating to his benefit. But of this we have no evidence. The public officers also might have refused to complete a settlement, until a more thorough examination had been had, or the new loan certificates had been brought in.

It is also said, that the subscriptions of the comptroller and register general shew by clear words, that the accounts of 1786 (the year wherein the errors took place) were not taken into consideration. The former officer states the account "examined, approved, and settled the above and foregoing accounts, "saving that any further error," &c. The latter states, "examined and entered the above balance, arising from the accounts "in this book, including the account of errors stated by the "comptroller general, reserving," &c. The book on the face of it, contains the transactions from the 1st September 1789, until the 9th November following. But the jury having referred to the settlement in the book, make it a part of their special verdict; and it appears thereby, that errors from the year 1783 to 1789 inclusive, were corrected therein. Consequently, there *necessarily must have been an examination of the accounts of those years by the accounting officers.

*554] counts of those years by the accounting officers.

But it is further objected, that the act of 1st April 1790, prescribes the mode of settlement; and unless the account has been examined, liquidated, and adjusted by the register general in the first instance, and afterwards examined and approved of by the comptroller general, and finally approved of by the Supreme Executive Council, it is no legal or valid settlement binding on the commonwealth.

It appears by the 4th section of that act, that it is confined "to demands hereafter made by individuals or bodies politic, "and to accounts hereafter to be opened between this state and "such bodies politic or individuals." Consequently, this account including demands prior to the passing of the act, and accounts opened and exhibited before the law had existence, as appears by the Journals of the assembly, is not embraced thereby; but the act of 28th March 1789, is solely applicable thereto. The comptroller general is directed by the 3d section of that act, "to submit all accounts which he shall hereafter adjust, "before he shall finally settle the same, to the inspection and "examination of the register general, and shall take his advice "and assistance in making such settlements, which shall be "laid before the Supreme Executive Council."

It appears moreover, that the mode of signature of the last final settlement of the account in question, on which the appeal is founded, is examined and entered by the register general, and approved and entered by the comptroller general. The first agrees with the present account; the second in the present account, is examined, approved, and settled, which are highly comprehensive terms.

The question recurs, is this account then a final settlement?

In the special verdict it is stated, that "the accounts of Da- "vid Rittenhouse as treasurer, were settled by the comptroller "and register general; that the settlement was reported to the "Supreme Executive Council, and by the council approved, "and a warrant drawn in favour of David Rittenhouse for the "balance, *prout* the said settlement by the register and comp- "troller general, the minutes of the Supreme Executive Coun- "cil and warrant."

In the words of the comptroller general, it is said to be "ex- "amined, approved and settled," and of the register general, to be "examined and entered." In the account of 1801, signed by both of the accounting officers, it is called a "general settlement "of his accounts." In the minutes of council of 18th November 1790, it is said to have been "settled" by the register and *comptroller general, and a balance of 5438l. 6s. found due the treasurer, and "approved of" by council, who in [*555 two days thereafter issued a warrant to him for the balance due to him upon his account, as late treasurer of the state until November 1789, as "settled" by the comptroller and register general on the 17th instant.

With such proofs before us we are compelled to say in the words of the department of accounts, that it was "a general set- "tlement;" and though errors may have arisen therein in the treasurer's statement of payments of new loan debt, it cannot at this distance of time be "again opened or questioned, but "the defendants, executors of the former treasurer, must be for- "ever quieted touching the same."

SMITH, J.    The fundamental question in this case, upon the solution of which the judgment we must give will depend, is, whether the acts done by the comptroller general, the register general, and the Supreme Executive Council in December 1790, on the accounts of David Rittenhouse, then late treasurer of this commonwealth, amount to a final settlement of them, or not, agreeably to the true intent and meaning of the several acts of assembly on the subject?

That these officers and the Supreme Executive Council, con- sidered the settlement as final, but subject to the reservation, seems clear beyond a doubt.    It was at one period of the argu- ment, contended, that at the time those acts were done, the pow- ers of the comptroller and register general were extinct.    The court at once, and I believe unanimously, were of opinion, that there was no foundation for that objection; and the counsel who made it, gave it up candidly, upon re-consideration.

But it is contended, that the accounts not being exhibited be- fore the 28th March 1789, they were in the first instance to be submitted to, examined, liquidated and adjusted by the register general, and examined and approved by the comptroller general, who should transmit such account to the Supreme Executive

Council for their final approbation ; and that this account not having been so acted upon, it was not intended by the officers, that it should be a final settlement.

The first impression of this part of the argument, had great weight on my mind. Indeed were it the true construction of the 4th section of the act of 1st April 1790, (2 St. Laws, 789,) I would be compelled to deem it fatal to the bar set up on the part of the defendants ; because I perfectly agree with the counsel who spoke last, on the part of the commonwealth, "that " when a rule of law is relied on, to bar a right, it is incumbent *556] " *on the party who would avail himself of it, to bring " himself strictly within it." But on examining that act, I find that this is not the construction of it. It declares, " that " it is expedient to enable the comptroller general to state the " account between this state and the United States, and to settle " and adjust to the 28th March, 1789, (the day on which the re- " ceiver general was appointed,) all accounts between this state " and individuals, or bodies politic, (other than the United States,) " and to report to the register general all such balances as were " then due to or from any individuals or bodies politic for the " purpose directed by the act of 28th March 1789, and the sup- " plement of 30th September 1789." There is an ambiguity in the rest of the preamble to this 4th section ; but the accounts between the 28th March 1789 and the 1st April 1790, must of course be settled according to the directions of the act of 28th March 1789, and the supplement of 30th September 1789 ; because the act of 1st April 1790, directs, that " all demands there- " after made, &c. shall in the first instance be submitted to, " examined, liquidated and adjusted by the receiver general." Therefore he had no authority to examine, liquidate and adjust in the first instance, any accounts before exhibited.

Even did it not appear by the receipt of the comptroller stated in the argument, that the accounts of David Rittenhouse were exhibited before passing the act of 1st April 1790, were it doubtful, yet as every officer, intrusted with the execution of a public duty, is presumed to execute it properly till the contrary appears, (2 Bla. Rep. 853, 2 Burr. 1073,) and as the account is settled agreeably to the directions of the preceding acts, it would be presumed, that the account was exhibited, before the act of 1st April 1790. David Rittenhouse having voluntarily resigned his office in the preceding November, would strengthen this presumption ; therefore, the accounts are finally settled according to the existing law, subject to correction within the year, unless the reservation gave a longer time for correction. No longer time could be given, without an express mutual agreement. We have no evidence that there was an agreement to extend the time for correction beyond the year. It is true, that it was not necessary to make the reservation, because the law gave it ; and it is equally true, that if it might be extended beyond the year, it might be extended to one hundred years. Every agreement

[Respublica v. Rittenhouse's Executors.]

must be certain, as to the subject matter of it ; if entirely uncertain, it is void.    This alledged agreement is unlimited as to time, and therefore it is of no effect.    I take it for granted, that it was inserted merely out of abundant caution.    It cannot controul an express law.    It were easy to point out the evil conse-
*quences of the construction contended for on the part [*557 of the state, but where the rules of law are clear, con- sequences are out of the question.

Upon the whole therefore, I am of opinion, that this was a final settlement within the true intent and meaning of the acts of assembly, no errors being discovered and corrected within the year.    And by the act of 18th February 1785, (2 St. Laws, 251,) § 11, it is provided, that " such error be discovered with- " in one year, &c. from and after the award of the said officer, " in any case which shall be laid before the Supreme Execu- -" tive Council, after which time the settlements shall not be " again opened or questioned, but the party, his heirs, execu- " tors or administrators shall be for ever quieted touching the " same."

I am compelled therefore to declare, that the commonwealth is barred from recovering the sum of 27,123 dollars and 80 cents found by the jury for the commonwealth, against the defendants.

BRACKENRIDGE, J.    The settlement in this case was general. It embraced every item of debt or credit.    The error lay in the addition ; but all was in view.

The settlement was by officers having authority to settle ; and the settlement was according to law.

It was a final settlement.    It was acted upon as such, in drawing a warrant for the balance.

The saving tacked to the settlement, could have no operation, but concurrent and co-extensive with the act of limitation and the reservation therein provided ; unless it did necessarily or presumptively follow, that the deceased was a party to the saving, and had given his assent to a farther extent.    But the saving was superfluous and inofficial.    It was on one side ; for *ex officio*, the report was made by the act of assembly and the course of the office, immediately to the council, and not delivered to the treasurer.

There was no fraud.    It was not the representation of a fact falsely, knowing it to be false, or not knowing whether it was or not, but undertaking to know ; for this would constitute a fraud. It was an error and not a fraud.

There is therefore nothing to take the case out of the statute ; and even against the deceased in his life time, the action in law would have been barred.

On such a settlement, after such a lapse of time, and the death of the party, his mouth closed and no explanation to be given, I do not know, but that equity would have said, that the

[De Benneville v. De Benneville.]

*account shall not be considered as open; and that, independent of the act there should be a bar. As it is, there can be no doubt.

My opinion is in favour of the defendants.

Judgment for the defendants.

This judgment was afterwards affirmed in the High Court of Errors and Appeals, July 25, 1807.